IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

NOV 06, 2024

LAURA A. AUSTIN, CLERK
BY:
s/B. McAbee
DEPUTY CLERK

| | | |
|---|---|---|
| JAMES MICHAEL ISERNIA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 4:22-cv-00022 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| DANVILLE REGIONAL MEDICAL | ) | By:  Hon. Thomas T. Cullen |
| CENTER, LLC, *et al.*, | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

This case is before the court on reconsideration of Defendants Danville Regional Medical Center, LLC ("DRMC") and HSCGP, LLC's ("HSCGP") (collectively, "Defendants" or "SOVAH") Motion to Dismiss and Compel Arbitration under the Federal Arbitration Act, 9 U.S.C. § 1, *et. seq.*, or, in the alternative, Motion to Dismiss Counts I and IV of the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (ECF Nos. 5, 6.)

Following an interlocutory appeal, the Fourth Circuit remanded this case to this court to decide whether Defendants, as non-signatories to an employment agreement between Plaintiff Dr. James Isernia ("Dr. Isernia") and Martinsville Physicians Practices, LLC ("MPP") ("Agreement"), are entitled to enforce the Agreement's arbitration provision. *Isernia v. Danville Reg'l Med. Ctr. et al*, No. 22-2224, 2024 WL 2131522 at *4 (4th Cir. May 15, 2024). Because the court finds that neither the third-party beneficiary doctrine nor equitable estoppel applies under Virginia law, Defendants' motion to compel arbitration will be denied. But the court will grant Defendants' motion to dismiss in part.

## I.   BACKGROUND & PROCEDURAL HISTORY

### A.  Factual Background

Dr. Isernia is an accomplished physician with over 25 years' experience. (Compl. ¶ 10 [ECF No. 1].) Relevant to this dispute, Dr. Isernia worked as a physician at SOVAH[1] for at least the past 10 years in various capacities and leadership roles until his termination on January 4, 2022. (*Id.* ¶¶ 4, 11.) Although Dr. Isernia contracted with MPP, he contends that he worked under the supervision and control of Defendants. (*Id.* ¶ 5.)

During his tenure with Defendants, Dr. Isernia was the only internal medicine or family practitioner in the Martinsville, Virginia, area that maintained both a hospital and clinical practice. (*Id.* ¶ 10.) Dr. Isernia saw numerous patients through the hospital, through the clinic, in nursing homes, and in-home visits, many of whom suffer from conditions such as drug addiction, asbestosis, cancer, black lung, and severe forms of arthritis. (*Id.* ¶ 20.)

On August 12, 2020, Dr. Isernia signed the Agreement with MPP. (ECF No. 6-1.) The Agreement assigned Dr. Isernia to work at a hospital owned and operated by Defendants,[2] neither of whom were signatories to the Agreement, although Defendants' hospital is identified as the affiliated "Hospital" in the Agreement. (*Id.*) The Agreement includes an arbitration provision, which mandates arbitration of "any dispute, breach, or other claim arising out of or related to this Agreement . . . in accordance with [the American Health Lawyers Association ("AHLA")] rules." (*Id.* ¶ 9.2.)

---

[1] The nature of the corporate structure between DRMC and HSCGP, the two entities that comprise SOVAH, is unclear, but SOVAH employs hundreds of physicians at both its Danville and Martinsville locations. (*Id.* ¶ 6.)

[2] Dr. Isernia was already working at Defendants' hospital when the August 2020 Agreement was signed.

In early 2020, the COVID-19 pandemic put a severe strain on medical services in Martinsville. (Compl. ¶ 14.) Because of COVID-19, SOVAH experienced staffing shortages and had to reassign employees to deal with pandemic practices. (*Id.* ¶ 15.) Specifically, SOVAH reassigned Dr. Isernia's nurse practitioner—who was responsible for assisting in the overflow care of his patients—to Occupational Health, an entirely different department. (*Id.*) In addition, SOVAH pulled other staff members who typically worked with Dr. Isernia to work the front entrance of the Medical Office Building, where they assisted with temperature checks, visitor restrictions, and aid to other physicians. (*Id.*)

Because of these changes, Dr. Isernia complained to SOVAH about the lack of proper staffing it was obligated to provide. (*Id.* ¶ 16.) In response, Dr. Isernia claims SOVAH management told him to "stick to doctoring." (*Id.*) Dr. Isernia continued to make frequent complaints, reports, and requests regarding the staffing levels and the need for properly trained staff to ensure patient and employee safety. (*See id.*)

Around December 2020, Defendants launched an audit into Dr. Isernia's prescribing practices. (*Id.* ¶ 17.) According to Dr. Isernia, the audit was initiated in response to his having allegedly printed or faxed 420 controlled substance prescriptions in May 2020 without properly using the electronic prescriptions for controlled substances ("EPCS") system.[3] (*Id.* ¶ 19.) As part of the audit, Compliance and Pharmacy/Quality department team members audited 10 random patients on the list of printed or faxed prescriptions reports from September 2020 and October 2020 to determine whether the May 2020 incident was an ongoing problem. (*See*

---

[3] Use of EPCS is considered best practice generally and at SOVAH. (Compl. ¶ 22.) But its use was not federally required until July 2020, after Dr. Isernia was audited the first time in June 2020. (*Id.*)

- 3 -

*id.* ¶ 17.) SOVAH claimed the results of the audit indicated that Dr. Isernia had not made improvements to his practices after earlier recommendations, and that he failed to comply with the best practices and tenets of chronic opioid management per the CDC, state regulations, and practice-specific standards. (*Id.* ¶ 18.) Dr. Isernia maintains that the volume and nature of his patient practice justified his prescribing practices. (*Id.* ¶ 20.)

Dr. Isernia alleges that he updated his patient charts and maintained documentation of all the prescriptions sent via EPCS in response to concerns and recommendations following the May incident. (*Id.* ¶ 21.) According to SOVAH, however, the results of the December 2020 audit indicated that there were still "concerns" that Dr. Isernia was "failing to comply with the best practices and tenets of chronic opioid management per CDC, state-specific regulations and practice-specific standards of practice." (*Id.* ¶ 23.) Dr. Isernia vehemently disputes these allegations. (*Id.*)

According to Dr. Isernia, the audit process was retaliatory and intentionally flawed. (*See id.* ¶¶ 26, 27.) Dr. Isernia alleges that SOVAH did not include him in the process, and it did not gather any information from his personal office staff, nurses, or anyone with medical knowledge. (*Id.* ¶ 26.) Further, the audit did not account for how Dr. Isernia provided patient care and completed administrative tasks, nor did SOVAH work with him to assess his treatment of patients or completion of administrative duties.[4] (*Id.* ¶ 27.) Moreover, Dr. Isernia contends that any staff SOVAH provided to cover filing duties in his office were ill-trained to provide the required level of assistance. (*Id.* ¶ 28.)

---

[4] For example, Dr. Isernia contends that each office maintains files differently, with no uniform practice. (Compl. ¶ 28.)

During the audit, the auditor claimed he could not find the relevant information, including "supportive documentation for chronic opioid prescribing." (*Id.* ¶ 29.) Dr. Isernia contends that SOVAH's own errors and lapses in proper record-keeping were responsible for the filing issues. (*Id.*) Dr. Isernia maintains that he kept proper records for each patient, but neither the auditor nor anyone else at SOVAH asked him about the location of the correct files. (*Id.*) Dr. Isernia, in fact, maintained the records in his own office because previous outsourcing of those tasks to other offices in SOVAH led to errors and failures. (*Id.* ¶ 30.)

In February 2021, an internal corporate review group reviewed the initial findings and concerns raised in the December 2020 audit. (*Id.* ¶ 24.) On March 9, 2021, the group issued a final written warning to Dr. Isernia regarding his prescribing practices, and specifically his failure to use the EPCS process for transmitting controlled substance prescriptions. (*Id.*) Prior to this final warning, Dr. Isernia had never, during 25 years as a practicing physician, received any reprimands or been subject to discipline for his work or prescribing practices. (*Id.* ¶ 25.)

On April 15, 2021, Pam Kane of SOVAH filed a complaint with the Department of Health Professions ("DHP") under Virginia Code § 54.1-2400.6(A)(4). (*Id.* ¶¶ 31, 32.) This complaint outlined how SOVAH took disciplinary action against Dr. Isernia, including issuing a "final written warning" "as a result of conduct that may cause injury to patients." (*Id.* ¶ 32.) Specifically, SOVAH alleged that Dr. Isernia's pattern of practice in prescribing opioids to patients might cause harm and was not in conformity with requirements for opioid prescribing. (*Id.*) Dr. Isernia contends not only that the term "final written warning" was misleading, since he had not been disciplined previously, but also that this allegation was false, malicious, and made in bad faith to retaliate against him. (*Id.* ¶¶ 31, 32.) The DHP complaint is not privileged

and could be published to Dr. Isernia's colleagues, his patients, and the general public. (*Id.* ¶ 31.)

Dr. Isernia responded to the DHP complaint on April 26, denying the accusations and providing written support that his record-keeping and prescribing practices did not violate any rules, guidelines, or laws. (*Id.* ¶ 33.) According to Dr. Isernia, SOVAH knew that his nurses maintained patient files in their office and that Dr. Isernia had previously complained about and discussed SOVAH's poor outsourcing and filing process. (*Id.* ¶ 42(a).)

On August 10, 2021, Dr. Isernia received an official Notification of Investigation from the DHP, which was triggered by SOVAH's complaint. (*Id.* ¶ 34.) In September, Dr. Isernia responded to this Notification, again denied all the allegations in the complaint, and provided documentation in support of his defense, including summaries of each patient's treatment regimen. (*Id.* ¶¶ 34, 35.)

On December 10, 2021, Dr. Isernia received notice of the results of a follow-up audit conducted by SOVAH, which alleged "continued non-compliance with state and practice specific regulations for the management of patients receiving chronic opioid therapy by: Failure to document reasonable justification for reasons to exceed 120 MME/day; Failure to consistently prescribe naloxone for any patient at risk; and Failure to document a comprehensive treatment plan and rationale to continue opioid therapy every 90 days." (*Id.* ¶ 36.) Dr. Isernia contends that this finding was also based on intentionally false and misleading information provided to DHP. (*Id.*)

On December 21, SOVAH placed Dr. Isernia on administrative leave, and on January 4, 2022, SOVAH terminated him. (*Id.* ¶ 37.) According to Dr. Isernia, SOVAH used the

"maliciously fraudulent complaint" as a tool to retaliate against him and fire him.[5] (*Id.*) On March 2, 2022, after SOVAH had terminated him, DHP sent a letter to Dr. Isernia stating that the "Board of Medicine has completed its review of the investigative report regarding disciplinary action taken against you by [SOVAH] . . . [and] the Board has determined that it will end its inquiry at this time. . . . [t]he disposition taken in this matter is not a disciplinary action [by DHP]." (*Id.* (alterations in original).)

## B. Procedural History

In response to his termination, Dr. Isernia sued Defendants for defamation *per se*, tortious interference, and retaliatory discharge in violation of Virginia Code § 40.1-27.3. (Compl. ¶¶ 39–79.) Specifically, Dr. Isernia alleged that DRMC fired him for complaining about staffing decisions. (*Id.* ¶¶ 15–16.) Defendants countered that they fired Dr. Isernia for violating its rules about prescribing opioids. (Mem. Supp. Mot. Dismiss and Compel at 2 n.4 [ECF No. 6].) On May 3, 2022, Defendants filed a Motion to Dismiss and Compel Arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1, 3, 4, and Fed. R. Civ. P. 12(b)(1) based on the arbitration provision in the Agreement between Dr. Isernia and MPP. (*See* ECF Nos. 5, 6.) Defendants also filed, in the alternative, a Motion to Dismiss Counts I and IV of the Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (*See id.*)

On July 18, 2022, this court granted Defendants' motion to compel arbitration and stayed the case pending the outcome of arbitration. (ECF No. 24.)[6] On August 1, Dr. Isernia

---

[5] Since his termination, Dr. Isernia says he has been contacted by former patients who indicated they are now receiving greater volumes of opioids, including Benzodiazepines in some cases, than they were under Dr. Isernia's care. (Compl. ¶ 38.)

[6] Originally, this court reasoned that the arbitration provision delegated the issue of whether the non-signatory defendants could enforce Dr. Isernia's arbitration provision with MPP against him to an arbitrator based on

filed a motion for reconsideration (ECF No. 26), which the court denied (ECF No. 32).[7] But given the uncertainty in the law, the court certified the controlling question of law for interlocutory appeal, *see* 28 U.S.C. § 1292(b), asking the Fourth Circuit to determine

> [w]hether a non-signatory to an arbitration provision that clearly and unmistakably incorporates arbitral rules delegating questions of "arbitrability" and "jurisdiction" to an arbitrator can move to compel arbitration of a third-party enforcement issue such that an arbitrator—and not a court—determines whether the non-signatory is entitled to enforce the arbitration provision against the signatory.

*Isernia v. Danville Reg'l Med. Ctr., LLC*, 2022 WL 4076113, at *11 (W.D. Va. Sept. 6, 2022).

On review, the Fourth Circuit held that the district court, not an arbitrator, must determine in the first instance whether Defendants are entitled to enforce the Agreement as non-signatories under state law. *See Isernia v. Danville Reg'l Med. Ctr. et al*, No. 22-2224, 2024 WL 2131522 (4th Cir. May 15, 2024). The case was remanded to this court for proceedings consistent with that opinion.

On September 13, 2024, the court held a status conference with the parties and gave them the opportunity to submit supplemental briefing on the enforcement question. (ECF No. 51.) Both parties submitted supplemental briefs, (*see* ECF Nos. 52, 53) and the matter is now ripe for disposition.

---

the plain language of the provision and out-of-circuit precedent. *Isernia v. Danville Reg'l Med. Ctr.*, No. 4:22-cv-00022, 2022 WL 4076113, at *1 (W.D. Va. Sept. 6, 2022).

[7] The court again denied the motion based on a review of the Federal Arbitration Act, Supreme Court precedent interpreting it, and other case law considering the issue. *Isernia*, 2022 WL 4076113, at *2.

## II.   STANDARD OF REVIEW

### A.  Motion to Compel under the FAA

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C § 2. The FAA reflects that arbitration agreements are matters of contract, *see Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010), and "courts must place arbitration agreements on equal footing with other contracts and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

In the Fourth Circuit, a litigant seeking to compel arbitration under the FAA must demonstrate "(1) a dispute exists between the parties; (2) the dispute falls within the scope of a written, valid agreement that includes an arbitration provision; (3) the parties' agreement relates to interstate or foreign commerce; and (4) the opposing party has failed or refused to arbitrate the dispute at hand." *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 595 (4th Cir. 2023). "A district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2022). Accordingly, "[i]n deciding whether to compel arbitration, courts must 'engage in a limited review to ensure that the dispute is arbitrable— *i.e.*, that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the scope of that agreement.'" *Hetrick Cos. LLC v. IINK Corp.*, 710 F. Supp. 3d 467, 481 (E.D. Va. 2024) (quoting *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999)).

"Any uncertainty regarding the *scope* of arbitrable issues agreed to by the parties must be resolved in favor of arbitration." *Murüthi v. Shuttle Express, Inc.*, 712 F.3d 173, 179 (4th Cir. 2013) (emphasis added).

Section 4 of the FAA provides that, when presented with a motion to compel arbitration, "[t]he court shall hear the parties" and "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. "In determining whether trial is necessary, the court applies the familiar summary judgment standard." *Soucie v. Va. Util. Prot. Serv., Inc.*, No. 7:22-cv-00552, 2023 WL 2991487, at *4 (W.D. Va. Apr. 18, 2023) (citing *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 564 (4th Cir. 2015)).

Under Rule 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Whether a fact is material depends on whether it "might affect the outcome of the suit" under the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). If no material facts are in dispute, the court will decide whether the parties intended to arbitrate their disputes as a matter of law. *See Chorley Enters., Inc.*, 807 F.3d at 564.

## B.  Motion to Dismiss under FRCP 12(b)(6)

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999); *see* Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "'naked assertion[s]' devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (some internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

### III.   ANALYSIS

## A.  Enforceability of the Agreement

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). To determine whether to compel parties to arbitrate a dispute, the court must determine whether a valid agreement to arbitrate exists. *See Hetrick Cos. LLC*, 710 F. Supp. 3d at 481.   The validity of an arbitration agreement is determined "according to state law principles governing contract formation." *Mey v. DIRECTV, LLC*, 971 F.3d 284, 288 (4th Cir. 2020).

The parties do not dispute that Dr. Isernia and MPP signed a valid contract containing an arbitration provision. Nor do the parties dispute that Defendants are not signatories to that Agreement. Generally, non-signatories to an arbitration provision—like Defendants here—have no right to compel arbitration unless some principle of state law or equity gives them this right. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 286–87 (4th Cir. 2023). But it is "well established" in Virginia[8] that "under certain circumstances, a party may sue to enforce the terms of a contract even though he is not a party to the contract." *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 268 (Va. 2019) (internal quotation omitted).

Defendants assert that two such principles under Virginia law empower them to enforce the Agreement and its arbitration provision against Dr. Isernia. First, Defendants argue that they are third-party beneficiaries of the Agreement between Dr. Isernia and MPP, and are therefore entitled to enforce the Agreement. Second, they argue that Dr. Isernia is equitably estopped from refusing to arbitrate his claims against Defendants. Either theory would allow Defendants to enforce the Agreement and its arbitration provision against Dr. Isernia. *See Weckesser v. Knight Enters. S.E., LLC*, 735 F. App'x 816, 821–22 (4th Cir. 2018) (analyzing whether a non-signatory could enforce an arbitration agreement as a third-party); *Davis v. Young & Assocs., Inc.*, No. 1:21-cv-00061, 2021 WL 4191384, at *5–6 (W.D. Va. Sept. 15, 2021) (applying third-party beneficiary doctrine to a non-signatory); *Am. Bankers Ins. Grp. v. Long*, 453 F.3d 623, 626–30 (4th Cir. 2006) (analyzing whether a non-signatory could enforce an arbitration agreement under a theory of equitable estoppel). Dr. Isernia argues that neither

---

[8] The parties do not dispute that Virginia law applies in this case.

- 12 -

theory is applicable, so Defendants cannot enforce the arbitration provision against him. The court agrees with Dr. Isernia.

### 1. Third-Party Beneficiary

To take advantage of the third-party beneficiary doctrine, "the third party must show that the contracting parties clearly and definitely intended that the contract confer a benefit upon him." *Collins v. First Union Nat'l Bank*, 636 S.E.2d 442, 446–47 (Va. 2006). There is a "critical difference" between "merely being [an entity] that will benefit from an agreement between other parties, and the very different situation in which a contract is entered into with the express purpose of conferring a benefit on a third party." *Env't Staffing Acquisition Corp. v. B & R Constr. Mgmt., Inc.*, 725 S.E.2d 550, 555 (Va. 2012).

To enforce the terms of a contract to which it was not a party, a non-signatory must show that it was an intended beneficiary of the contract and "not merely an incidental beneficiary." *Tingler*, 834 S.E.2d at 268. "[A]n intended beneficiary is such an integral part of the obligations assumed by the contracting parties" that a court would allow that party to enforce the contract. *Id.* To establish a clear and definite intent to confer such a benefit, the court may look to an express statement in the contract or go beyond the "four corners" of the agreement and analyze the surrounding circumstances. *Id.* at 268–69. At bottom, "[t]he essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party . . . ." *Copenhaver v. Rogers*, 384 S.E.2d 593, 596 (Va. 1989).

Dr. Isernia argues that the court cannot read the Agreement to conclude that Defendants were an intended beneficiary of the Agreement. (Mem. Opp'n Mot. Dismiss and Compel at 14 [ECF No. 21].) He argues that Defendants are not mentioned anywhere in the

Agreement and are only listed as an "affiliate Hospital" once. *Id.* But, as Defendants point out, the "Hospital" (referring to Defendants) is mentioned in several provisions of the Agreement. (Reply Supp. Mot. Dismiss and Compel at 4 [hereinafter "Reply"] [ECF No. 22].) These stray references, however, are not enough. None of these references contain an express statement of the parties' intent that the "Hospital" be an intended beneficiary of the Agreement. Therefore, the court must look to the Agreement as a whole and its circumstances.

Construed as a whole, Defendants are still not the intended beneficiaries to the Agreement. Many of the references to Defendants ("Hospital") appear to be boilerplate language or describe how the "Hospital" fits into the arrangement without going so far as to name Defendants as an intended beneficiary as opposed to an incidental beneficiary. For example, Defendants point to the Agreement's non-compete and non-solicitation clauses that include "affiliates of MPP, like the Hospital." (Reply at 4.) Standard clauses that purport to cover general affiliates "like the Hospital" are too vague to establish that Dr. Isernia and MPP intended Defendants to be a third-party beneficiary of the Agreement. Likewise, references that Dr. Isernia must maintain privileges at the "Hospital," not create a negative working environment there, or allow the "Hospital" to share his information are all general terms that could apply to any affiliate "Hospital" named in the Agreement, or any successor entity should MPP choose to affiliate with another healthcare provider during Dr. Isernia's employment. None of those terms, alone or collectively, rise to the level of a clear and definite intent to confer a benefit upon Defendants *specifically*.

Additionally, Article 9.1 of the Agreement states that "[MPP] may assign this Agreement, which shall inure to the benefit of and be binding upon the parties hereto . . . ."

(ECF No. 6-1 ¶ 9.1.) This language suggests that the parties only intended themselves to be the beneficiaries of the Agreement. *See United States ex rel. Oldham v. Centra Health, Inc.*, 548 F. Supp. 3d 568, 579 (W.D. Va. 2021) (finding that virtually identical language in a contract also did not support a third-party beneficiary theory).

Defendants also argue that because they are a parent company to MPP, the Agreement and its arbitration provision must cover this dispute. In support, Defendants cite the proposition that when allegations against "a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration," even though they are a non-signatory. (Mem. Supp. Mot. Dismiss and Compel at 12 (citing *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416 (4th Cir. 2000)).) In such a case, forcing the parent company to try the case while the subsidiary is subject to arbitration would thwart the policy goals of arbitration. (*Id.* (citing *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988)). But that is not the case here. Dr. Isernia only brings claims against the parent company—HSCGP—and not the subsidiary, MPP. Therefore, this is not a case where the defendants would be split between arbitration and trial and a concern over policy or equity would arise. The court, moreover, will not endorse the broad proposition that *any* non-signatory parent entity necessarily has a right to enforce an agreement signed by its subsidiary when the subsidiary is not a party to the suit. The entities have chosen to contract this way—and Defendants have chosen this elaborate corporate structure and means of employing physicians—so the court will not decree that Defendants are intended beneficiaries of the Agreement purely based on corporate interplay.

- 15 -

Finally, Defendants argue that Dr. Isernia's allegation in the Complaint that Defendants "were at all times relevant, joint employers, integrated employers, and/or apparent agents with Martinsville Physicians, LLC with respect to Dr. Isernia's employment," demonstrates that Defendants were intended to be beneficiaries of the Agreement. (Compl. ¶ 69.) For one, although Defendants make much of the "joint employer" language, the determination of whether entities are a "joint employer" is a legal conclusion that need not be taken as true when alleged in a complaint. In other words, the court need not hold this allegation against Dr. Isernia and conclude that he has contradicted or pleaded himself out of court. And even if true, that point alone does not mean Defendants are necessarily an intended third-party beneficiary. *See also infra* Part III.A.2. Because the Agreement has neither an express purpose nor the context or circumstances to suggest Defendants are intended third-party beneficiaries to the Agreement, they may not enforce the Agreement's arbitration provision on this basis.

### 2. Equitable Estoppel

A non-signatory may also rely on equitable estoppel doctrines under state law to enforce an arbitration agreement. *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 438 (2020). There are two different circumstances in which equitable estoppel may apply.

#### a. Reliance on the Agreement

First, estoppel applies when a signatory "must rely on the terms of the written agreement in asserting [its] claims" against a non-signatory. *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 395–96 (4th Cir. 2005) (internal quotation omitted) (holding that estoppel applies where claims "intertwined" with terms of the contract); *see also GE Energy Power*

*Conversion France SAS, Corp.*, 590 U.S. at 438; *Wachovia Bank, Nat. Ass'n v. Schmidt*, 445 F.3d 762, 769 (4th Cir. 2006) (finding a signatory estopped when he "relies on the terms of, and seeks benefit from" the contract). "When each of a signatory's claims against a non[-]signatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement." *Brantley*, 424 F.3d at 396 (cleaned up). "Because this legal test examines the nature of the signatory's underlying allegations against the non-signatory," the court must examine the underlying claims to determine if estoppel applies. *Am. Bankers Ins. Grp., Inc.*, 453 F.3d at 627.

Generally, estoppel is appropriate when "the signatory's underlying complaint is based on the non-signatory's alleged breach of the obligations and duties assigned to it in the agreement."[9] *Id.* at 628 (cleaned up). For example, in *American Bankers v. Long*, the plaintiffs brought tort claims including fraud, negligence, and civil conspiracy against American Bankers Insurance Group ("ABIG"). *Id.* at 625–26. Previously, the plaintiffs and a third party entered into a promissory note and an associated agreement that mandated arbitration for any claims relating to the note. *Id.* at 625. ABIG, as a non-signatory to that agreement, sought to compel arbitration because the plaintiffs' tort claims relied on the terms of the note. *Id.* at 626. The court found that without the breach of the note, the plaintiffs "would have no cause to complain" and their claims, though artfully phrased, merely attempted to "hold [ABIG] to the terms of the [Note]." *Id.* at 630 (alterations in original). Therefore, the court held that the plaintiffs were equitably estopped from arguing that ABIG was not a party to the arbitration clause. *Id.*

---

[9] The claim need not be specifically a breach-of-contract claim.

Similarly, in *Decisive Analytics Corp. v. Chikar*, a Virginia state court found that equitable estoppel applied where the plaintiff's claims (including conversion, breach of fiduciary duty, fraud, etc.) were dependent on the allegation that the defendant breached a duty created by a subcontract. No. CL 2008-6171, 2008 WL 6759965, at *7 (Va. Cir. Ct. July 15, 2008). Finally, in *Aggarao v. MOL Ship Mgmt. Co.*, the court found that a plaintiff's alleged injuries occurred while he was acting in the scope of his employment, and his employment contract set forth terms and conditions, including duties to provide a seaworthy vessel, maintenance and cure, and wages. 675 F.3d 355, 375 (4th Cir. 2012). Therefore, the court found that his claims necessarily arose from his employment contract. *Id.*

In this case, Dr. Isernia's claims of defamation, tortious interference, and retaliation do not arise from any duties created by the Agreement. Nor do any of these claims "relate directly" to the Agreement or its terms. Dr. Isernia could have brought these claims against Defendants regardless of any duties created in the Agreement or any breach thereof. In fact, his claims could be asserted—and, in fact, are asserted—in the *absence* of any alleged breach of the Agreement.

Defendants argue that this position is too narrow and that Dr. Isernia's claims only exist because he has an employment relationship with MPP and, by extension, Defendants that was created by the Agreement; therefore, they necessarily "arise out of" or at least "relate to" his status as an MPP employee. (Reply at 6.) But it is Defendants' view that is too broad. It is true, from the cases explained above, that the court will take a closer look into the claims and not accept mere artful pleading to avoid arbitration. But in those cases, the duties were

created by the contract at issue and its breach or terms were a prerequisite to bringing the claims. Not so here.

While the Agreement is a fact underlying Dr. Isernia's claims, those claims do not rely on the Agreement. If the Agreement were not there, the claims could and would still exist. Dr. Isernia's defamation claim in no way relies on the Agreement or his employment status. The only connection is that the Agreement led to Defendants forming a relationship with Dr. Isernia to be able to make an allegedly defamatory statement against him.[10] Catalyzing the meeting of two parties is surely too generic and attenuated of a connection under this standard. The same is true of Dr. Isernia's tortious interference claims; they do not rely on any obligations created by the Agreement, and its terms are only tangentially related to Dr. Isernia's claims, even though their existence is a fact underlying the claims. *See Wachovia Bank*, 445 F.3d at 770. Finally, the retaliation claim arises from a statutory right of an employee against his employer and, again, does not rely on any obligations or duties set forth in the Agreement. Therefore, Dr. Isernia's claims do not "arise out of" or "relate directly" to the Agreement such that he would be equitably estopped on this basis.

### b. Interdependent and Concerted Conduct

Second, equitable estoppel applies when a signatory raises claims of "substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." *Aggarao*, 675 F.3d at 373 (quoting *Brantley*, 424 F.3d at 396); *see also Decisive Analytics Corp.*, 2008 WL 6759965, at *6–7 (adopting the Fourth Circuit tests for

---

[10] Moreover, Dr. Isernia already had a relationship with Defendants and was working at the hospital prior to this specific August 2020 Agreement being signed.

estoppel). Specifically, Defendants emphasize *Aggarao*'s language that "there must be allegations of coordinated behavior between a signatory and a non[-]signatory defendant and that the claims against both the signatory and non[-]signatory defendants must be based on the same facts, be inherently inseparable, and fall within the scope of the arbitration clause." (Reply at 6 (quoting *Aggarao*, 675 F.3d at 374).) But this test counsels against Defendants' position. For one, Dr. Isernia does not plead any allegations of coordinated behavior between MPP and Defendants. Second, Dr. Isernia has only brought claims against non-signatories. *Aggarao* contemplates, as do all of Defendants' authorities,[11] that *both* a signatory and non-signatory are included as defendants, and factually inseparable claims are brought against them both. This is not the case here. Dr. Isernia does not name, let alone bring any claims against, MPP, the signatory to the Agreement. There cannot be any allegation of interdependent or concerted action when the signatory party is not alleged to have done anything.

Defendants again raise the argument that pleading that Defendants and MPP are "joint employers" results in "allegations of substantially interdependent and concerted misconduct by both a non-signatory and one or more signatories." (Mem. Supp. Mot. Dismiss and Compel at 13 (quoting *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 850 (D. Md. 2013).)

---

[11] Defendants' authorities regarding interdependent or concerted action all involve cases in which claims against both signatory and non-signatory defendants exist, and therefore equitable estoppel applies to enforce arbitration against the non-signatory. *See, e.g., Dennie v. MedImmune, Inc.*, No. PX 16-3643, 2017 WL 2930462, at *4 (D. Md. July 10, 2017) (holding an arbitration clause covers a non-signatory defendant where concerted action was found with eight other counts against signatory defendant); *Market Am., Inc. v. Chuanjie Yang*, No. 1:17CV897, 2018 WL 3406865, at *10 (M.D.N.C. July 12, 2018) (holding an arbitration clause covers individual non-signatory defendants as officers and agents of corporate signatory defendant engaged in a "single enterprise"); *Hunter v. NHCash.com, LLC*, No. 3:17-cv-384, 2017 WL 4052386, at *5 (E.D. Va. Sept. 12, 2017) (holding an arbitration clause covers non-signatory defendants and the lone signatory defendant where plaintiff alleged the same claims against all defendants); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 849–50 (D. Md. 2013) (holding an arbitration clause is enforceable where the plaintiff brings claims against signatory and non-signatory defendants as co-conspirators under a theory of joint and several liability).

But that does not necessarily follow. The joint-employment doctrine "prevents those who effectively employ" someone from evading liability. *See Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 410 (4th Cir. 2015).[12] Dr. Isernia presumably seeks to hold Defendants liable for retaliation based on the theory that they properly qualify as his employer, through the "joint employer" doctrine, for purposes of his retaliation claim. *See infra* Part III.B.2. This does not necessarily mean that all parties are alleged to have committed misconduct *or* that they necessarily acted in concert.[13] Though joint, employers can take independent action such that they are independently liable. *See, e.g.*, *Brantley*, 424 F.3d at 396 (finding equitable estoppel does not apply where plaintiff did not allege concerted action, "plaintiffs' claim is based entirely on actions taken by . . . a non[-]signatory[,] . . . [and] the plaintiffs' claims against [non-signatory] do not implicate [signatory] in any wrongdoing"); *Crump v. United States Dep't of Navy*, No. 2:13cv707, 2016 WL 901262, at *1 (E.D. Va. Mar. 3, 2016) ("[A] joint employer relationship does not automatically create liability in a joint employer for actions taken by a co-employer."); *Torres-Negron v. Merck & Co.*, 488 F.3d 34, 40 n.6 (1st Cir. 2007) ("[A] finding that two companies are an employee's 'joint employers' only affects each employer's liability to the employee for their own actions, not for each other's actions."). Dr. Isernia alleges that Defendants, not MPP, illegally retaliated against him. Accordingly, the court is not persuaded by Defendants' arguments and finds that equitable estoppel does not apply in this case.

---

[12] "The joint employment doctrine is distinct from the 'single employer' or 'integrated employer' doctrine." *Butler*, 793 F.3d at 408 n.3.

[13] A review of Dr. Isernia's allegations shows that he contends it is quite the opposite.

Because Defendants are not third-party beneficiaries and Dr. Isernia is not equitably estopped from avoiding arbitration, there is no valid, enforceable agreement to arbitrate between Dr. Isernia and Defendants. Therefore, Defendants' Motion to Dismiss and Compel Arbitration will be denied.

## B. 12(b)(6) Failure to State a Claim

In the alternative, Defendants seek dismissal of Counts I and IV of the Complaint for failure to state a claim. For the following reasons, the court will deny the motion to dismiss Count I but grant the motion to dismiss Count IV.

### 1. Defamation *Per Se* (Count I)

In Virginia, a plaintiff claiming defamation must allege the "(1) publication of (2) an actionable statement with (3) the requisite intent." *Lokhova v. Halper*, 995 F.3d 134, 145 (4th Cir. 2021); *see also Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015). "An 'actionable' statement is both false and defamatory." *Schaecher*, 772 S.E.2d at 594. At the motion to dismiss stage, "a court must accept as false any statement which the Complaint alleges to be false," and the key question becomes "whether the statements referenced in the Complaint are defamatory." *Lokhova*, 995 F.3d at 145. "Defamatory words are those tending so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* (quoting *Schaecher*, 772 S.E.2d at 594). Moreover, "it must be apparent on the face of the pleading that the alleged defamatory statements are of and concerning the plaintiff." *Id.* (internal citation omitted). "Under Virginia law, a private figure must make a showing that the defendant published the statement knowing that it was false, or believing it to be true, lacked reasonable grounds for such belief, or acted

- 22 -

negligently in failing to ascertain the facts on which the publication was based." *Steele v. Goodman*, 382 F. Supp. 3d 403, 420 (E.D. Va. 2019) (internal quotation omitted).

Certain statements are considered defamatory *per se* under Virginia law, including "[t]hose which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment," and "[t]hose which prejudice such person in his or her profession or trade." *Tronfeld v. Nationwide Mut. Ins. Co.*, 636 S.E.2d 447, 450 (Va. 2006). "For such statements, Virginia law presumes that the plaintiff suffered actual damage to [his] reputation and, therefore, no proof of damages is required." *AvePoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496, 506 (W.D. Va. 2013) (citing *Fleming v. Moore*, 275 S.E.2d 632, 636 (Va. 1981)).

Defendants argue that Dr. Isernia has not sufficiently alleged intent because SOVAH's complaint to DHP only demonstrates that Defendants reported investigated concerns to the Board of Medicine as mandated by Virginia Code § 54.1-2400.6(A)(4). Therefore, Defendants contend, the mandatory-reporting requirement creates a qualified privilege that shields them from liability.

To be sure, the Virginia Supreme Court has recognized that "[t]he principle of qualified privilege protects a communication from allegations of defamation if made in good faith, to and by persons who have corresponding duties or interests in the subject of the communication." *Harless v. Nicely*, 900 S.E.2d 503, 509 (Va. 2024). Statements "made between co-employees and employers in the course of employee disciplinary or discharge matters" may qualify, and "employment matters are occasions of privilege in which the absence of malice is presumed." *Id.* (internal quotation omitted). But "[a] qualified privilege is lost if a plaintiff

- 23 -

proves by clear and convincing evidence that the defamatory words were spoken with common-law malice." *Id.* (internal citation omitted). "Common-law malice is defined as some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff." *Id.* (internal quotation omitted). Common law malice can also be proven by showing that "statements were made with knowledge that they were false or with reckless disregard for their truth" or that "statements were not made in good faith." *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 665 (E.D. Va. 2015) (citing *Cashion v. Smith*, 749 S.E.2d 526, 533 (Va. 2013)).

In this case, Defendants argue that Virginia Code § 54.1-2400.6(A)(4) imposes a duty on them to report investigations to DHP. The statute states, in relevant part, that a hospital shall report to DHP

> [a]ny disciplinary proceedings begun by the institution, organization, facility, or provider as a result of conduct involving (i) intentional or negligent conduct that causes or is likely to cause injury to a patient or patients, (ii) professional ethics, [or] (iii) professional incompetence . . . . The report required under this subdivision shall be submitted within 30 days of the date of written communication to the health professional notifying him of the initiation of a disciplinary proceeding.

Va. Code Ann. § 54.1-2400.6(A)(4). Defendants' complaint to DHP containing the alleged defamatory statements notes that the purpose of the report is to fulfill their obligations under § 54.1-2400.6(A)(4) since they have taken a disciplinary action through a "final written warning" because of conduct "that may cause injury to patients." (ECF No. 1-1.) Given this statutory duty and DHP's interest in receiving reports of disciplinary actions regarding patient safety, Defendants' complaint falls within the type of communication that must be reported to DHP. *Cf. Sailes v. Richardson*, No. 3:16-cv-00325, 2017 WL 6550389, at *4 (E.D. Va. Dec.

22, 2017) (finding qualified privilege applies where a testing official was required by regulations to report an investigation into testing irregularities to the Virginia Department of Education). Accordingly, as an initial matter, Defendants' complaint would seem to be entitled to a qualified privilege under Virginia law.

But the inquiry does not end there. Dr. Isernia argues that even if a qualified privilege facially applies, he has adequately pled common-law malice to overcome the privilege at this stage. The court agrees. Dr. Isernia has pleaded facts that, if true, would establish that SOVAH knew or had reckless disregard for the falsity of the statements at issue. (*See* Compl. ¶¶ 40–46.) Those facts include that SOVAH knew where Dr. Isernia kept his files, that the filing system was hindered by poor staffing, that logs could have been checked to evaluate Dr. Isernia's compliance, that there was a backlog on reports, and that SOVAH held an ill will toward Dr. Isernia from his repeated complaints. (*Id.* ¶¶ 42–43.) Moreover, a dispute or question regarding malice raises a triable issue of fact about Defendants' knowledge or reckless disregard for the truth. *See Goulmamine*, 138 F. Supp. 3d at 667. Accordingly, applying a qualified privilege is not appropriate at the motion to dismiss stage of *this* case.[14] Because Dr. Isernia has pleaded the elements of a defamation claim and Defendants are not entitled to qualified privilege at this stage, the motion to dismiss Count I will be denied.

## 2. Retaliation (Count IV)

Virginia Code § 40.1-27.3(A)(1) provides that "[a]n employer shall not discharge, discipline . . . or take other retaliatory action regarding an employee's compensation, terms,

---

[14] Defendants may raise the issue of qualified privilege again on a motion for summary judgment after discovery and further factual material has been gathered.

conditions, location, or privileges of employment, because the employee . . . in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official . . . ." Va. Code Ann. § 40.1-27.3(A)(1) ("VWPL"). To establish a retaliation claim under the VWPL, Dr. Isernia must establish that: "(1) he made a good faith report of a federal or state violation to a supervisor, (2) was discharged [or disciplined] by his employer, and (3) his report was the 'but for' cause of his discharge." *Workman v. LHC Group, Inc.*, No. 1:23-cv-048, 2024 WL 3572305, at *3 (W.D. Va. July 29, 2024) (quoting *Moore v. Cooper River Shared Servs., LLC*, No. CL-2023-9565, 2024 WL 366099, at *9 (Va. Cir. Ct. Jan. 30, 2024)) (cleaned up). To succeed on his claim, a plaintiff "need only prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003) (cleaned up). As this court has noted, when a complaint is "self-evidently a complaint about a violation of federal law," a plaintiff does not need to specifically identify a violation of law to state a claim under the VWPL. *Hariston v. Nilit Am., Inc.*, No. 4:23-cv-00011, 2023 WL 5447370, at *6 n.6 (W.D. Va. Aug. 24, 2023).

Dr. Isernia seemingly concedes in his Memorandum in Opposition to Defendants' motion that his Complaint does not plead sufficient facts to show he engaged in protected activity. His Complaint merely references complaints he made generally about staffing levels or record keeping. Accordingly, the court finds that, on its face, the Complaint does not sufficiently allege a report of a violation of federal or state law. And this is not a case where an alleged report of staffing levels is "self-evidently" a complaint about a violation of law. Dr. Isernia attempts to clarify his claim by identifying specific provisions of state and federal law

in his brief. But the court only looks to the Complaint on a motion to dismiss, not to *post hoc* allegations raised in later pleadings. *See E.I du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011). Therefore, the court finds that Dr. Isernia has failed to sufficiently allege a violation of the VPWL and will grant Defendants' motion to dismiss Count IV.

In Dr. Isernia's Memorandum in Opposition to Defendants' motion he states that if the court finds he has not pled sufficient facts to sustain his retaliation claim, he will seek leave to amend his Complaint.[15] (*See* Mem. Opp'n Mot. Dismiss and Compel at 24.) Given this statement and the court's dismissal of the retaliation claim, the court construes Plaintiff's briefing as a request for leave to amend. Accordingly, in the interest of justice, the court will grant Dr. Isernia leave to amend his Complaint under Fed. R. Civ. P. 15(a)(2).

## C.  Default Judgment

As a final matter, Dr. Isernia argues that he is entitled to a default judgment on Counts II and III of the Complaint because Defendants have failed to answer on those claims. A motion to dismiss falls squarely within the meaning of "otherwise defend" for purposes of Fed. R. Civ. P. 55. But Dr. Isernia argues that Defendants' Motion to Dismiss only addresses Counts I and IV. This misreads Defendants' motion. As Defendants correctly point out, their original Motion to Dismiss and Compel Arbitration requested dismissal of the Complaint in its entirety and the removal of all claims to arbitration.[16] Defendants then *separately* argued the

---

[15] He also provides a brief argument in support of his request for leave to amend.

[16] Defendants cite the FAA §§ 3 and 4, which allow dismissal of the action and all claims upon compelling arbitration. Additionally, Defendants bring the Motion to Dismiss and Compel under Fed R. Civ. P. 12(b)(1) and 12(b)(6). Any one of these arguments properly qualifies as a response.

court should dismiss Counts I and IV in the alternative. Therefore, Defendants have properly answered or defended against all of Dr. Isernia's claims, and default judgment is inappropriate.[17]

## IV.   CONCLUSION

For the foregoing reasons, the court will deny Defendants' primary Motion to Dismiss and Compel Arbitration. The court will also deny Defendants' motion in the alternative to dismiss Count I, but will grant Defendants' motion to dismiss Count IV. The court, however, will grant leave to Plaintiff to file an Amended Complaint within 14 days.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 6th day of November, 2024.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[17] Moreover, a motion to dismiss some claims in a complaint serves to toll a response to unchallenged claims. *See, e.g., Maass v. Lee*, 189 F. Supp. 3d 581, 587 (E.D. Va. 2016) (noting that "numerous courts have held" that "the filing of a Rule 12 . . . motion for partial dismissal postpones the deadline for filing an answer to all claims, not just those subject to the motion").